[No. 62838-1-I.   Division One.   December 28, 2009.]

XIAO PING CHEN, *Individually and as Personal Representative*, ET AL., *Appellants*, v. THE CITY OF SEATTLE, *Respondent*.

_____

*James C. Buckley* and *Ronald L. Unger* (of *Buckley & Associates PS*) and *Philip A. Talmadge* and *Peter Lohnes* (of *Talmadge/Fitzpatrick*), for appellants.

*Thomas A. Carr, City Attorney*, and *Rebecca Boatright* and *Stephanie P. Dikeakos, Assistants*, for respondent.

*Keith K. Kessler* and *Garth L. Jones* on behalf of Stritmatter Kessler Whelan Coluccio, amicus curiae.

¶1 DWYER, A.C.J. — A municipality has a duty to all travelers to maintain its roadways in conditions that are safe for ordinary travel. Whether roadway conditions are reasonably safe for ordinary travel depends on the circumstances surrounding a particular roadway. Although relevant to the determination of whether a municipality has breached its duty, evidence that a particular physical defect in a roadway rendered the roadway dangerous or misleading or evidence that a municipality was in violation of a law concerning roadway safety measures are not essential to a claim that a municipality breached the duty of care owed to travelers on its roadways. A trier of fact may conclude that a municipality breached its duty of care based on the totality of the circumstances established by the evidence. Xiao Ping Chen adduced several pieces of evidence raising a genuine issue as to whether the city of Seattle failed to maintain in a reasonably safe condition the crosswalk in which her now-deceased husband, Run Sen Liu, was struck by an oncoming car. Therefore, the city was not entitled to summary judgment on Chen's negligence claim. Accordingly, we reverse and remand.

I

¶2 On a rainy evening in February 2007, Liu was struck by a car driven by Peter Brown at the intersection of South Jackson Street and 10th Avenue South in Seattle's International District. Liu was crossing from the north side of South Jackson Street to its south side through a marked crosswalk. South Jackson Street is a five-lane arterial. At

the time of the incident, there were no stoplights, stop signs, or pedestrian signals at the intersection. There were, however, stoplights and pedestrian signals on South Jackson Street at the intersections both preceding and following 10th Avenue South (8th Avenue South and 12th Avenue South). The 10th Avenue South intersection contained only pole-mounted signs at the curbs warning that there was a crosswalk and an overhead "Crosswalk" sign with a flashing light suspended above the street. Liu almost crossed the street safely; Brown's car collided with him in the curbside lane heading eastbound—the fifth and final lane Liu had to cross in order to walk from one side of the street to the other. He suffered a severe brain injury, among other trauma, and spent two years in a coma before dying. Chen brought a claim of negligence against Brown. She also brought a negligence action against the city, claiming that it failed to maintain the crosswalk in a reasonably safe condition for ordinary travel.

¶3 Evidence produced during discovery showed that Liu's accident was not the first serious accident that occurred in the crosswalk. Records produced by the city revealed that, as early as 1992, numerous residents from the surrounding neighborhood had petitioned the city to install stoplights at the intersection because of difficulties they had experienced while trying to cross the street. The city received requests throughout the next decade. In 1999, the city installed a pedestrian island in the center turn lane to provide a refuge at the midway point for pedestrians as they made their way across all five lanes. The city has no record of pedestrian/motor vehicle accidents reported during the time the island was in place. However, at the request of a nearby business, the city removed the island in 2002 in order to facilitate easier left turns through the intersection. Records prepared by city employees indicate that in the five-year period after the island was removed and before Liu was hit, there were at least eight other pedestrian-motor vehicle accidents at this intersection. One of these accidents, which occurred in the same crosswalk in which Liu was hit, resulted in the pedestrian's death.

¶4 Studies of the volume of traffic—or average daily traffic count (ADT)—passing through the intersection conducted before and after the incident show that approximately 16,000 motor vehicles traveled through the intersection every day. These studies also show that every day hundreds of pedestrians crossed the intersection, which is roughly 56 feet wide and takes the average pedestrian 19 seconds to cross. According to both parties' experts, this amount of time constituted the necessary crossing "gap" for the intersection at South Jackson Street and 10th Avenue South. A "gap" is a break in the flow of traffic sufficiently long to allow a pedestrian to cross from one side of the street to the other without having to stop for oncoming cars. Gap studies conducted by the city showed that, before Liu was hit, there were only 6 to 10 gaps per hour; postaccident studies showed that the number of gaps per hour ranged from 3 to 29.

¶5 Chen also submitted a 2005 study conducted by Charles Zegeer for the Federal Highway Administration (Zegeer study). The city took part in this study as it was being prepared, and the director of the city's Department of Transportation later incorporated some of the findings of the Zegeer study into an administrative rule concerning safety measures for marked crosswalks in Seattle (director's rule). The Zegeer study concluded that "[m]arked crosswalks alone are insufficient (i.e., without traffic-calming treatments, traffic signals and pedestrian signals when warranted, or other substantial crossing improvement) and should not be used . . . [o]n a roadway with four or more lanes without a raised median or crossing island that has . . . an ADT of 15,000 or greater." The director's rule incorporated this recommendation and characterized a roadway with these conditions as "[u]sually not a good candidate for a marked crosswalk."

¶6 In addition, Chen submitted the declarations of two engineering expert witnesses. Each of these witnesses concluded that the crosswalk did not adhere to sound engineering principles and posed a danger to pedestrians

because it did not provide for adequate crossing "gaps." One of these witnesses, Edward Stevens, had analyzed the crosswalk following the fatal 2002 pedestrian/motor vehicle collision that occurred in the crosswalk. He had apprised the city of his opinion that the crosswalk was unsafe as early as 2005 in litigation arising out of the prior accident. Stevens also opined that the intersection was more dangerous at night because of drivers' diminished ability to see pedestrians in the crosswalk. Stevens testified at his deposition, however, that nothing at the intersection obstructed a pedestrian's view of oncoming traffic and that nothing was particularly confusing about the intersection for a motorist. He also agreed that, while "traffic conditions on the roadway may be confusing or misleading to a pedestrian, . . . the configuration of the roadway itself is not." William Haro, Chen's other engineering expert witness, opined that the city created an unsafe condition when it removed the pedestrian island.

¶7 Chen also submitted the declaration of Gerson Alexander, an expert on ergonomics and human factors.[1] Alexander opined that the crosswalk presented a dangerous condition because pedestrians often have trouble accurately gauging the speed and distance of vehicles that are approaching from several hundred feet away and therefore might overestimate the margin of safety they have to cross an intersection. Specifically, he declared that "it is extremely difficult for pedestrians waiting to cross South Jackson to ascertain the distance, speed and time they have to get the necessary 56.3 feet across the intersection without being struck." In his deposition, Alexander acknowledged that there was nothing about the crosswalk or the configuration of the intersection that was dangerous or misleading "per se," but he testified consistently with his

---

[1] According to Alexander's declaration, "[h]uman factors is a branch of psychology that examines the application of capabilities and limitations of human beings as they relate to their physical environment. . . . As a human factors analyst, [Alexander is] qualified to analyze and give opinions about the interaction between roadway characteristics and the cues it conveys to the roadway users, including drivers and pedestrians."

declaration that the combination of the crosswalk distance, problems of human perception, and the volume and speed of vehicular traffic passing through the intersection combined to create a dangerous condition at the crosswalk.

¶8 The city moved for summary judgment of dismissal. Pointing to the deposition testimony of Chen's experts that the crosswalk did not contain any physical defect rendering the crosswalk inherently dangerous or misleading, the city argued that Chen had failed to produce any evidence establishing that the crosswalk presented an unsafe condition. The city also argued that it was not in violation of any law requiring safety measures different from those installed at the crosswalk. On this point, the city noted that the *Manual on Uniform Traffic Control Devices* (MUTCD), which Washington has adopted, *see* RCW 47.36.020; WAC 468-95-010, did not require the city to remove, move, or further regulate the marked crosswalk at issue. Further, the city argued that the Zegeer study and the director's rule applied only to the installation of future crosswalks, not to preexisting crosswalks such as the one in which Liu was fatally injured.

¶9 The trial court granted the city's motion. Chen appeals.

## II

¶10 We review de novo a trial court's order granting summary judgment. *Estate of Haselwood v. Bremerton Ice Arena, Inc.*, 166 Wn.2d 489, 497, 210 P.3d 308 (2009) (citing *Biggers v. City of Bainbridge Island*, 162 Wn.2d 683, 693, 169 P.3d 14 (2007)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "A material fact is one upon which the outcome of the litigation depends in whole or in part." *Atherton Condo. Apartment-Owners Ass'n*

*Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990) (citing *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974)). In determining whether a genuine issue of material fact exists, we view all facts and draw all reasonable inferences in favor of the nonmoving party. *Owen v. Burlington N. Santa Fe R.R.*, 153 Wn.2d 780, 787, 108 P.3d 1220 (2005) (citing *Ruff v. County of King*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995)).

¶11 Chen claims that the city was negligent in maintaining the crosswalk in which Liu was struck by Brown's oncoming car. To prevail on this claim of negligence, Chen must prove that the city owed Liu a duty of care, that the city breached its duty, and that the city's breach was the proximate cause of Liu's injuries. *Ruff*, 125 Wn.2d at 704 (citing *Hansen v. Wash. Natural Gas Co.*, 95 Wn.2d 773, 776, 632 P.2d 504 (1981); *LaPlante v. State*, 85 Wn.2d 154, 159, 531 P.2d 299 (1975)); *see also Keller v. City of Spokane*, 146 Wn.2d 237, 242, 44 P.3d 845 (2002) ("The elements of negligence are duty, breach, causation, and injury." (citing *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985))). At issue here is whether genuine issues of material fact exist as to the first two elements of Chen's negligence claim.[2]

### III

¶12 The city contends that the duty it owed to Liu extended only to eliminating particular physical defects in the crosswalk that would have rendered the crosswalk inherently dangerous or misleading and to implementing safety measures required by law. The city further maintains that proof of its failure to do either of these things is essential to Chen's claim. We disagree.

¶13 "Whether a municipality owes a duty in a particular situation is a question of law." *Keller*, 146 Wn.2d at 243 (citing *Hansen v. Friend*, 118 Wn.2d 476, 479, 824

---

[2] The city's motion did not address the question of proximate cause.

P.2d 483 (1992)). Implicit in this question are the questions "to whom the duty is owed, and what is the nature of the duty owed," which define the scope of the municipality's duty. *Keller*, 146 Wn.2d at 243 (citing *Wick v. Clark County*, 86 Wn. App. 376, 385, 936 P.2d 1201 (1997) (Morgan, J., concurring)). The parties agree that the city owed Liu a duty of care. They sharply dispute, however, what this duty entailed and, thus, which facts are material to the determination of whether the city breached its duty.

¶14 "[M]unicipalities are generally held to the same negligence standards as private parties." *Keller*, 146 Wn.2d at 242-43 (citing *Bodin v. City of Stanwood*, 130 Wn.2d 726, 731, 927 P.2d 240 (1996)). Thus, they are "held to a general duty of care, that of a 'reasonable person under the circumstances.' " *Keller*, 146 Wn.2d at 243 (quoting DAN B. DOBBS, THE LAW OF TORTS § 228, at 580 (2000)). Specifically with respect to individuals who travel on a municipality's roadways, a municipality owes a duty to all travelers to maintain its roadways in a condition that is reasonably safe for ordinary travel.[3] *Owen*, 153 Wn.2d at 786-87 (citing *Keller*, 146 Wn.2d at 249); *see also Ruff*, 125 Wn.2d at 704. Our Supreme Court has explained that a municipality's duty to maintain its roadways in a reasonably safe condition includes the "duty to eliminate an inherently dangerous or misleading condition." *Owen*, 153 Wn.2d at 788 (citing *Keller*, 146 Wn.2d at 249).

¶15 The city argues that Chen can prevail only if she shows that a particular physical defect in the crosswalk itself rendered the crosswalk inherently dangerous or inherently misleading or if she shows that the city was in

---

[3] In several cases decided before *Keller*, Washington courts defined the scope of a municipality's duty in this regard as being owed to persons using roadways in a " 'proper manner' " or while " 'exercising ordinary care for their own safety.' " *Keller*, 146 Wn.2d at 246-47 (discussing cases). Some of the decisions referenced herein employed this language in defining a municipality's duty to maintain its roadways in a safe condition. In *Keller*, however, our Supreme Court clarified that, consistent with the State's law concerning contributory fault in negligence actions, *see* RCW 4.22.005, "a municipality owes a duty to *all* persons, whether negligent or fault-free, to build and maintain its roadways in a condition that is reasonably safe for ordinary travel." 146 Wn.2d at 249 (emphasis added).

violation of a statute, ordinance, or regulation concerning maintenance of the crosswalk. The implication of the city's argument is that a trier of fact may not determine, based on the totality of the circumstances, that the city breached its duty of care unless one of these two conditions is satisfied. In effect, the city argues that the scope of its duty to Liu extended only to eliminating actual physical defects or to taking action expressly required by a statute, ordinance, or regulation. The city is incorrect on both accounts.

¶16 Although the city contends that this case presents an issue of first impression, in reality the question of whether Chen can prove that the city was negligent without showing that the crosswalk contained a physical defect is not a novel one. Nearly 70 years ago, our Supreme Court addressed the question of which facts are material to determining whether a municipality has breached its duty to maintain a roadway in a manner that is reasonably safe for ordinary travel. *See Berglund v. Spokane County*, 4 Wn.2d 309, 103 P.2d 355 (1940). In light of the analysis and holding in *Berglund*, we conclude that it is not essential for Chen to prove that the crosswalk contained a particular defective physical characteristic rendering the crosswalk inherently misleading or inherently dangerous. Rather, a trier of fact may infer that the city breached the duty of care it owed to Liu based on the totality of the surrounding circumstances.

¶17 The situation in *Berglund* is highly analogous to that herein presented. Berglund's claim concerned whether Spokane County had failed to maintain in a reasonably safe condition a bridge that it had built for use by both pedestrians and motor vehicles. *Berglund*, 4 Wn.2d at 316. The bridge essentially provided the only way for travelers in the vicinity to cross from one side of a river to the other. *Berglund*, 4 Wn.2d at 316. Even though the bridge was maintained to accommodate pedestrian traffic as well as vehicular traffic, it contained "no footpath or sidewalk for pedestrians." *Berglund*, 4 Wn.2d at 316. Pedestrians walked between the bridge railing and the edges of traffic

lanes. *Berglund*, 4 Wn.2d at 316-17. Berglund was hit by a truck that drove out of its lane of traffic and into the space where Berglund was walking. *Berglund*, 4 Wn.2d at 312.

¶18 The court emphasized that "[t]his situation, of itself, would not necessarily present a dangerous condition." *Berglund*, 4 Wn.2d at 316. The court did not, however, limit its analysis to the issue of whether the bridge contained a defective physical characteristic rendering it inherently dangerous. Instead, it also considered that the volume of traffic on the bridge was heavy, that numerous pedestrians were required to cross the bridge daily, and that the county was aware, prior to Berglund's accident, that motor vehicles had nearly hit pedestrians on several occasions. *Berglund*, 4 Wn.2d at 316-17. In other words, the court concluded that what was material was not just whether the physical structure of the bridge was safe for pedestrian travel in isolation but whether the bridge was reasonably safe in light of its intended use and the actual situation that existed on the roadway.

¶19 In considering these several factors, the court declared that "the determination of whether or not a municipality has exercised reasonable care . . . must in each case necessarily depend upon the surrounding circumstances." *Berglund*, 4 Wn.2d at 315-16 (citing *Ferguson v. City of Yakima*, 139 Wash. 216, 246 P. 287 (1926); *Lewis v. City of Spokane*, 124 Wash. 684, 215 P. 36 (1923); *James v. City of Seattle*, 68 Wash. 359, 123 P. 472 (1912)). The court did not hold that Berglund, in order to prevail on a claim of negligence against the county, was required to establish the existence of a physical characteristic of the bridge that "necessarily present[ed] a dangerous condition." *Berglund*, 4 Wn.2d at 316. Instead, it clarified that the "vital question . . . is not whether the county was, *in any event*, required to build a sidewalk . . . but whether, *under the circumstances*, [the county] exercised the required amount of care to maintain the bridge in a reasonably safe condition for pedestrians . . . who had been invited to use it." *Berglund*, 4 Wn.2d at 317-18 (emphasis added). Indeed,

nothing indicates that the physical design of the bridge at issue in *Berglund* was inherently dangerous or inherently misleading. Rather, what made the conditions on the bridge dangerous was the simultaneous use of the roadway by both pedestrians and motor vehicles. Moreover, by inviting, indeed directing, pedestrians to use the bridge along with motor vehicles, the county had a duty to "exercise reasonable care to keep [the bridge] in a reasonably safe condition for [both of the intended modes of] travel." *Berglund*, 4 Wn.2d at 317.

¶20 The similarities between this case and *Berglund* are striking. Similar to Berglund, Chen contends that the totality of the circumstances surrounding the crosswalk made the crosswalk dangerous, while the city maintains, similar to the arguments advanced by the county in *Berglund*, that it had no duty to design the crosswalk and control the flow of pedestrian and vehicular traffic through the intersection any differently than it did. The city may be correct that the crosswalk, by itself, was not inherently dangerous or inherently misleading. But our Supreme Court made clear in *Berglund* that the analysis of whether a dangerous condition at a roadway exists and, in turn, whether a municipality has breached its duty to maintain the roadway in a reasonably safe condition, does not begin and end with consideration of only the physical characteristics of the roadway at issue. Thus, in the situation herein presented, what are also material to the determination of whether the city exercised reasonable care under the circumstances are the intended uses of the crosswalk and of the intersecting street and the conditions at the crosswalk. Accordingly, proof that a particular physical defect rendered the crosswalk inherently dangerous or inherently misleading is not essential to Chen's claim.

¶21 The city reads some of our Supreme Court's opinions in cases decided after *Berglund* as abrogating the reasoning and holding in *Berglund*. *See Owen*, 153 Wn.2d 780; *Ruff*, 125 Wn.2d 697; *Ulve v. City of Raymond*, 51 Wn.2d 241, 317 P.2d 908 (1957). Our Supreme Court, however, did not

indicate in these cases that it was overruling its holding in *Berglund*. To the contrary, in both *Owen* and *Ulve*, the court explained that its determination of whether sufficient evidence to sustain the claims of negligence brought against the respective municipalities in those cases turned on the myriad circumstances surrounding the roadways therein at issue. *See Owen*, 153 Wn.2d at 790; *Ulve*, 51 Wn.2d at 251-52. In neither case did the court indicate that proof of particular physical defects in the roadways therein at issue were essential to the plaintiffs' claims. Moreover, in the context of a negligence action against a municipality, our Supreme Court has recently relied directly upon *Berglund* in articulating that "the determination [of] whether a municipality has exercised reasonable care 'must in each case necessarily depend upon the surrounding circumstances.'" *Bodin*, 130 Wn.2d at 734 (quoting *Berglund*, 4 Wn.2d at 316). Our Supreme Court's subsequent decisions have not eroded *Berglund*'s precedential value.

¶22 The third case cited by the city, *Ruff*, is readily distinguishable from *Owen, Ulve*, and this case. Ruff specifically claimed that the physical characteristics of the roadway, by themselves, rendered the roadway therein at issue unsafe for ordinary travel. *Ruff*, 125 Wn.2d at 701. He did not allege that any other circumstances surrounding the roadway combined with the road's physical characteristics to make the roadway unsafe. The court concluded that the road authority was entitled to summary judgment because the undisputed evidence—in particular the testimony and declarations of Ruff's own experts—established that the roadway was in excellent physical condition at the time of the accident and was neither inherently dangerous nor inherently misleading. *Ruff*, 125 Wn.2d at 706-07. However, the court did not indicate that it directed its analysis exclusively toward the evidence concerning the roadway's physical characteristics for any reason other than the narrow focus of Ruff's claims and the fact that the evidence at issue concerned only the roadway's physical characteristics as they related to vehicular traffic. In read-

ing *Ruff* as requiring a plaintiff to show that a roadway suffers from a particular physical defect, the city overstates its holding.

¶23 The city also argues that it was not required to install additional traffic safety measures because the traffic moving through the intersection constituted an open and obvious hazard.[4] In advancing this argument, however, the

---

[4] In advancing this argument, the city cites to several decisions of courts in other jurisdictions, in which those courts held that high traffic volumes by themselves do not constitute dangerous conditions such that the absence of traffic or pedestrian signals or stop signs at those locations could not cause liability to attach to municipalities for negligent maintenance of the roadways. *See Song X. Sun v. City of Oakland*, 166 Cal. App. 4th 1177, 83 Cal. Rptr. 3d 372 (2008); *Orlando v. Broward County, Fla.*, 920 So. 2d 54 (Fla. Dist. Ct. App. 2005); *Brenner v. City of El Cajon*, 113 Cal. App. 4th 434, 6 Cal. Rptr. 3d 316 (2003); *King ex rel. King v. Brown*, 221 N.J. Super. 270, 534 A.2d 413 (1987). These cases, however, are inapposite to the factual situation herein presented, as they do not involve situations in which pedestrians crossed a street through *marked crosswalks. See Sun*, 166 Cal. App. 4th at 1180-81 (involving pedestrian who was killed while crossing an intersection in an "unmarked pedestrian crosswalk," which had been previously marked but not remarked after the city repaved the street); *Orlando*, 920 So. 2d at 56 (involving a child who was killed by an oncoming vehicle while crossing the street in front of his school midblock, "not at a crosswalk," to reach his mother waiting on the other side of the road); *Brenner*, 113 Cal. App. 4th at 436 (involving a pedestrian/vehicle collision where the pedestrian was attempting to cross a street "near" an intersection and contrasting it with a case in which a pedestrian was hit by a car in an unmarked crosswalk at an uncontrolled intersection while trying to catch a bus); *King*, 221 N.J. Super. at 272 (involving a pedestrian attempting to cross a street midblock, not at an intersection, who walked into the rear of a vehicle traveling in the first lane of traffic he tried to cross). In addition, the nature of the plaintiffs' claims and the reasons for dismissal in some of these cases also make them inapposite. *See Orlando*, 920 So. 2d at 56 (holding that sovereign immunity against claims arising out of discretionary policy decisions barred plaintiff's claim that her child's death, caused while crossing the street to be picked up from school, was a proximate result of the school board's negligence in planning the end of the school day to coincide with rush hour traffic and in not extending bus service to her child). Also, the California cases involved a statutory scheme governing a municipality's duties toward travelers that differs from the duties that Washington municipalities have under the common law.

Further, the city overlooks part of the court's analysis in *King* that actually undermines its argument advanced herein. The *King* court clarified that its decision barring recovery on a theory that the municipality maintained a dangerous condition on the roadway did not rest "on a distinction between physical defects in public property and activities on that property." 221 N.J. Super. at 274. It continued:

> In our view, a condition of public property which is safe for one activity may become a dangerous condition when the property is converted to a different activity. For example, a bridge designed solely for pedestrian use may become

city ignores that a pedestrian using a crosswalk is given a preference over individuals using other modes of transportation. A "marked crosswalk" is "any portion of a roadway *distinctly indicated* for pedestrian crossing by lines or other markings on the surface thereof." RCW 46.04.290 (emphasis added). Motor vehicles must yield to pedestrians in marked or unmarked crosswalks. RCW 46.61.235(1). That the law directs pedestrians to use crosswalks can be inferred from the lack of priority given to pedestrians who cross at points other than crosswalks: "Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway." RCW 46.61.240(1). Although the law does not permit a pedestrian to walk "suddenly" into a crosswalk so that an approaching vehicle cannot stop, RCW 46.61-.235(2), Washington courts have long recognized that a pedestrian in a crosswalk "may assume that the driver of a vehicle will recognize the pedestrian's right of way." *Knight v. Pang*, 32 Wn.2d 217, 232, 201 P.2d 198 (1948); *see also Jung v. York*, 75 Wn.2d 195, 198, 449 P.2d 409 (1969) (citing *Jerdal v. Sinclair*, 54 Wn.2d 565, 342 P.2d 585 (1959)); *Burnham v. Nehren*, 7 Wn. App. 860, 864, 503 P.2d 122 (1972) (citing *Shasky v. Burden*, 78 Wn.2d 193, 470 P.2d 544 (1970)). Indeed, one of the city's own traffic engineers testified in a deposition that the crosswalk herein at issue was the only crosswalk at the intersection and that it was the preferred location for pedestrians to cross the intersection.

¶24 By establishing certain presumptions in their favor, the law directs pedestrians to use marked crosswalks.

---

dangerous when converted to use by vehicular traffic if its structure cannot support the additional load. In most cases, application of the dangerous condition standard requires consideration of both the physical characteristics of the public property as well as the nature of the activities permitted on that property. Indeed, the definition of dangerous condition . . . *requires consideration of the reasonably foreseeable use of the property*.

*King*, 221 N.J. Super. at 274-75 (emphasis added). The city ignores *King*'s holding that whether a roadway is dangerous depends, at least in part, on how and for what purpose the roadway will be used.

Therefore, the city has a corresponding duty to maintain its crosswalks in a manner that is reasonably safe for ordinary travel in light of the circumstances at each particular crosswalk. A municipality's decision to open a roadway triggers its duty to maintain the roadway in a reasonably safe condition. The circumstances present on the particular roadway dictate that which will constitute reasonably safe maintenance. *Berglund*, 4 Wn.2d at 317-18. " '[A]s the danger [at a particular roadway] becomes greater, the [municipality] is required to exercise caution commensurate with it.' Simply stated, the existence of an unusual hazard may require a city to exercise greater care than would be sufficient in other settings." *Owen*, 153 Wn.2d at 788 (first alteration in original) (citation omitted) (quoting *Ulve*, 51 Wn.2d at 246, 251-52).

¶25 Therefore, by virtue of its decision to direct pedestrians to walk in the crosswalk herein at issue, the city had a duty to ensure that the crosswalk would be reasonably safe for its intended use in light of the circumstances present at the crosswalk, which included the busy intersection through which the pedestrians were directed to walk. Traffic control measures that render safe one crosswalk may be insufficient to render safe another crosswalk of the same length and in the same physical condition because of vehicular traffic or other factors. That which constitutes reasonable care in a particular situation depends on the surrounding circumstances. *Keller*, 146 Wn.2d at 243 (quoting DOBBS, *supra*, at 580). In the context of the city's duty to maintain its roadways in a reasonably safe condition, its duty is not necessarily limited only to eliminating physical defects or to implementing mandatory traffic control devices.

¶26 There is likewise no merit to the city's argument that its duty to safely maintain roadways is tempered by motorists' duties to also exercise reasonable care. Although the city need not insure against the negligence of drivers, *Keller*, 146 Wn.2d at 252, who are always bound to exercise due care to avoid colliding with pedestrians, *see* RCW

46.61.245, the negligence of motorists with respect to pedestrians is not determinative of whether road conditions were safe for pedestrian travel. The city owes a duty to pedestrians and motorists alike. The negligence of a third party does not absolve the city of its duty to maintain its roadways, including crosswalks, in a reasonably safe manner. *Tanguma v. Yakima County*, 18 Wn. App. 555, 561-62, 569 P.2d 1225 (1977) (quoting *Lucas v. Phillips*, 34 Wn.2d 591, 597-98, 209 P.2d 279 (1949); RESTATEMENT (SECOND) OF TORTS §§ 447, 449 (1965)). As the cases discussed above make clear, the circumstances that existed at the crosswalk provide the facts relevant to determining whether the city breached its duty to Liu.

¶27 Also without merit is the city's argument that it did not breach its duty to maintain the crosswalk in a safe condition because the MUTCD did not require it to install additional safety measures at the crosswalk. The MUTCD provides that "[t]he need for a traffic control signal at an intersection . . . shall be considered" if the pedestrian volume exceeds 190 in any one-hour period or 100 in each hour of a four-hour period and there are fewer than 60 gaps per hour during those periods.[5] The city maintains that because these conditions were not satisfied, no traffic signal at the intersection of 10th Avenue South and South Jackson Street was warranted. The city is incorrect, however, in concluding that, because conditions triggering a mandatory duty to consider the installation of traffic signal were not met, it had no duty to consider installing such a signal in light of the actual conditions of the roadway. "Liability for negligence does not require a direct statutory violation, though a statute, regulation, or other positive enactment may help define the scope of a duty or the standard of care." *Owen*, 153 Wn.2d at 787 (citing *Bauman v. Crawford*, 104 Wn.2d 241, 244-45, 704 P.2d 1181 (1985)).

---

[5] Although the MUTCD was adopted in its entirety, the code reviser determined not to publish every regulation contained in the MUTCD. WAC 468-95-010. The MUTCD provision cited, *supra*, is not in the published code but is contained in our Clerk's Papers.

¶28 None of the cases on which the city relies requires a plaintiff to prove that a particular physical defect of the roadway, by itself, made the roadway unsafe. Our Supreme Court has consistently held that consideration of all of the surrounding circumstances is necessary to determine whether a particular roadway presented an unsafe condition. In determining whether a dangerous condition exists at a roadway and whether a municipality has breached its duty to maintain a roadway in a safe condition, the trier of fact may infer that a breach has occurred based on the totality of the relevant surrounding circumstances, regardless of whether there is proof that a defective physical characteristic in the roadway rendered the roadway inherently dangerous or inherently misleading. That Chen may not have put forth evidence that the crosswalk itself contained a defective physical characteristic making the crosswalk misleading or dangerous is not dispositive.

¶29 Having clarified which types of facts are material to Chen's claim, we now address whether there is evidence in the record to raise a genuine issue as to whether the city breached its duty to Liu.

IV

¶30 The city contends that Chen failed to adduce evidence raising a genuine issue as to whether the crosswalk was unsafe and, correspondingly, whether the city breached the duty of care it owed to Liu. Again, we disagree.

¶31 We observe at the outset that whether a roadway was safe for ordinary travel and whether a municipality took adequate corrective action are questions of fact. *Owen*, 153 Wn.2d at 788. Such questions concern a municipality's negligence and " 'are generally not susceptible to summary judgment.' " *Owen*, 153 Wn.2d at 788 (quoting *Ruff*, 125 Wn.2d at 703).

¶32 There is ample evidence in the record raising a genuine issue as to whether the city breached its duty to Liu to maintain the crosswalk in a reasonably safe condi-

tion for ordinary travel. The evidence shows that the city was aware of several accidents and near-accidents that had occurred in this crosswalk before Liu was struck. The city does not dispute that, from 1992 to 1999, it received dozens of requests from area residents for the installation of a traffic signal at the intersection. Records maintained by city employees reflect that there were many reported accidents both before the installation of a pedestrian island in 1999 and after the island was removed in 2002. But the city's records do not reflect that any accidents were reported during the period the island was in place.

¶33 In addition, each of Chen's expert witnesses concluded that the crosswalk presented a dangerous condition. "[A]n expert opinion on an 'ultimate issue of *fact*' is sufficient to defeat a motion for summary judgment." *Eriks v. Denver*, 118 Wn.2d 451, 457, 824 P.2d 1207 (1992) (quoting *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 352, 588 P.2d 1346 (1979)). Chen's experts' conclusions are based on the small number of crossing gaps resulting from the city's decision to maintain the crosswalk through five lanes of traffic without interruption. The traffic volume studies demonstrate that the ADT at the crosswalk exceeded the volume deemed safe for a marked crosswalk crossing four or more lanes of traffic without a pedestrian island, as set forth in the director's rule and recommended by the Zegeer study. The city was aware of the Zegeer study and had incorporated portions of the study's findings into its own internal guidelines. Although the Zegeer study did not itself carry the force of law, the study nonetheless bears on whether the city acted reasonably in maintaining the crosswalk as it did in light of the history of accidents at the intersection. Whether conditions at the crosswalk were unsafe and whether the city was negligent in failing to eliminate them must be determined with respect to all of the surrounding circumstances.

¶34 Further, that the experts agreed that nothing obstructed the views of pedestrians or drivers and that the physical layout of the intersection was not confusing does

not settle the issue of whether the conditions at the crosswalk were unsafe. Alexander's expert report and testimony tend to prove that pedestrians can be poor judges of the speeds at which oncoming vehicles are traveling. The evidence in the record also shows that the intersection at 10th Avenue South and South Jackson Street differed from other intersections along South Jackson Street in that it did not have traffic and pedestrian signals. Viewed in the light most favorable to Chen as the nonmoving party, the evidence raises genuine issues as to whether an unsafe condition existed and whether the city breached its duty of care. Therefore, the city was not entitled to summary judgment.

¶35 Reversed and remanded.

Cox and Appelwick, JJ., concur.

Review denied at 169 Wn.2d 1003 (2010).