IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| LINDA NESTOR, individually and as Personal Representative of THE ESTATE OF DR. PATRICK NESTOR, and ELLIOT NESTOR, | No. 84510-1-I |
| Appellants, | DIVISION ONE |
| | UNPUBLISHED OPINION |
| v. | |
| STATE OF WASHINGTON and JOHN WHITE, JR., | |
| Respondents. | |

CHUNG, J. — While the Nestors were on the Northgate Way on-ramp to southbound Interstate 5 (I-5) in Seattle, John White, who was exiting I-5 south on the neighboring exit ramp, lost control of his vehicle. White's vehicle left the exit ramp, became airborne, and landed on top of the Nestors' car, causing serious injuries to Linda Nestor and her son Elliot, and fatal injuries to her husband Patrick. The Nestors filed a lawsuit against White and the State of Washington alleging negligence. The State moved for summary judgment, which the trial court granted on the issues of breach, causation, and discretionary immunity and dismissed the claim against the State. We agree that summary judgment was proper because, while the State had a duty to provide a roadway that was reasonably safe for ordinary travel, the evidence did not establish a genuine

issue of material fact as to whether the State breached that duty. Therefore, we affirm the trial court's dismissal of the Nestors' claim against the State.

FACTS

On January 5, 2020, John White was suffering from mental health issues and self-medicating with alcohol and drugs. Intoxicated and experiencing a panic attack, White drove to his friend's house. At some point during the drive, White became suicidal, "that limbo of not caring if [he] lived, not caring if [he] died." He drove recklessly and at excessive speeds southbound on I-5. One witness estimated he was driving over 80 miles per hour. Another witness said that White was driving 75 to 80 miles per hour, attempted to pass cars on the left shoulder, then crossed over all lanes of traffic and passed more cars while driving on the right shoulder. She estimated White was driving 80 to 90 miles per hour on the right shoulder when he took the exit ramp.

White exited the highway at Northgate Way. A sign on the side of I-5 near the entrance to the off-ramp indicates an exit speed of 35 miles per hour. Upon taking the exit, a driver encounters a sign showing the road curves to the right and then to the left and a speed limit of 25 miles per hour. Approaching the curve to the right, a right arrow sign points the direction of the first curve with a 25 miles per hour sign. Then the driver enters a second curve, this time to the left. These two curves in the off-ramp are depicted in the photo below.



Travelling at a high rate of speed, White failed to negotiate the first curve to the right and went off the road into the grassy median at the circle shown in the photo. His vehicle became airborne and struck the driver's side and top of a vehicle as it was proceeding on the on-ramp from Northgate Way to southbound I-5. The accident is depicted in the diagram below from the Washington Police Traffic collision report.



The vehicle on the on-ramp was being driven by Dr. Patrick Nestor, with his wife, Linda, and son Elliot, in the car with him. The collision killed Patrick and seriously injured Linda and Elliot.[1]

An accident reconstruction expert determined that White was driving 91 m.p.h. approximately five seconds before impacting the Nestors' vehicle. However, because the vehicle data showed that White had already begun applying his brakes, he was likely travelling in excess of 91 m.p.h. At this point, White had already driven past the 35-m.p.h. advisory speed sign for the off-ramp and was about to drive past a 25-m.p.h. sign. White was traveling approximately 63 m.p.h. when he entered the grassy median. He travelled approximately 120 feet through the median and struck the Nestors' vehicle at 38 m.p.h. White's vehicle rolled completely and came to rest approximately 65 feet beyond where it collided with the Nestors.

---

[1] Elliot Nestor, Linda Nestor, and the Estate of Dr. Patrick Nestor are the plaintiffs in this case, collectively referred to as the Nestors.

White was estimated to have had a blood alcohol level between .183 and .195 and THC[2] in his system. He was convicted of vehicular homicide, vehicular assault, and reckless driving and received a sentence of 131 months of incarceration.

The Nestors filed a complaint against White for negligent operation of his vehicle and against the State of Washington for failure to provide a reasonably safe roadway. The State moved for summary judgment, supported by declarations from four experts. The Nestors responded with a report by expert Dale Dunlap, excerpts from deposition transcripts, and traffic collision reports attached as exhibits to their attorney's declaration. The State's reply included objections to consideration of this evidence.

The trial court determined that the State had a duty to the Nestors, but granted summary judgment on breach and causation. The trial court also granted summary judgment "based on discretionary immunity to the extent the Plaintiffs argue that the road should have been improved by adding a guardrail even if the order was reasonably safe for ordinary travel." The court entered a partial final judgment for the State under CR 54(b) and stayed the proceedings against White pending resolution of this appeal.

The Nestors appeal the partial final judgment. White submitted a brief joining the Nestors in their positions and arguments. The State cross-appealed the trial court's consideration of certain evidence submitted in opposition to its motion for summary judgment.

---

[2] Tetrahydrocannabinol.

## DISCUSSION

### I.    State's Objections to Evidence

The Nestors submitted Dunlap's expert report, deposition excerpts, and accident reports as exhibits to their attorney's declaration in opposition to the State's motion for summary judgment. The State's cross-appeal challenges the admissibility of these documents due to various deficiencies with the exhibits.

King County Local Civil Rule 56(e) states in relevant part that "[a] party objecting to the admissibility of evidence submitted by an opposing party must state the objection in writing in a responsive pleading, [and] a separate submission shall only be filed if the objection is to materials filed in the reply."[3] The State complied with King County LCR 56(e) by raising its objections to the Nestors' evidence in its reply to the Nestors' response to the motion for summary judgment.

First, the State argued that the Nestors' attorney, who attached "true and accurate cop[ies]" of Dunlap's curriculum vitae (CV), report, and deposition excerpts, as well as White's deposition and Washington Police Traffic Collision reports, as exhibits, could not authenticate the attachments and exhibits based on her personal knowledge,[4] so the documents are inadmissible. Similarly, Dunlap's report and CV were appended to the Nestors' attorney's declaration,

---

[3] A comment regarding LCR 56(e) notes that it was "added to obviate the filing of motions to strike objectionable evidence," to "clarify local practice and to conform to Cameron v. Murray, 151 Wn. App. 646, 658, 214 P.3d 150 (Div. I, 2009)." Cameron noted that it was "misleading" to label as a " 'motion to strike'; what is actually an objection to the admissibility of evidence that could have been preserved in a reply brief rather than by a separate motion." Id.

[4] Initially the attorney's declaration lacked a certification under penalty of perjury, but the court allowed her to supplement with a corrected version containing the requisite certification language.

and the State objected that Dunlap did not provide a sworn affidavit or declaration with his report.[5]

Further, the Nestors' attorney also appended excerpts of Dunlap's deposition as an exhibit to her declaration. The State noted that the Nestors failed to include the court reporter's certification for the submitted excerpts of Dunlap's deposition, and therefore, argued the excerpts were not properly authenticated.[6]

Finally, the State argued that Dunlap based his report on data protected by the evidentiary privilege under 23 U.S.C. § 407, which applies to information for the purpose of developing highway safety construction improvements using federal highway funds. Dunlap testified he did not rely on this information to form his opinions and would have reached the same conclusions without the privileged information.

At oral argument on the State's summary judgment motion, regarding the State's evidentiary objections, the trial court stated,

---

[5] However, Dunlap's introduction to his report states that the attorney's firm had retained his company as an engineering consultant to evaluate the I-5 interchange at issue in the case. He also included a cover page noting the law firm and directing the report to two attorneys.

[6] Under the federal rules of evidence, "A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent." Orr v. Bank of Am., NT & SA, 285 F.3d 764, 774 (9th Cir. 2002). An attorney's declaration is insufficient. Id.

However, Orr allows that "when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity." 285 F.3d at 776. Here, the State properly submitted parts of Dunlap's deposition, including the reporter's certification, as an exhibit to its attorney's declaration. Thus, the State authenticated Dunlap's deposition, which then establishes authenticity for the excerpts of the same deposition submitted by the Nestors. While Orr does allow a court to exclude "unauthenticated extracts of a document are submitted that do not readily indicate that they are parts of the same document authenticated by another party," 285 F.3d at 776 n.16, the Dunlap deposition excerpts admitted by the State and the Nestors have identical headers and footers which suggests they are the same document.

> [E]ven if I overlook the lack of a sworn statement for Mr. Dunlap himself his deposition address essentially overcame that technical defect. And so I want it to be clear I'm not relying on that. And I'm also not relying on the fact that the [ ] reports may be privileged. Even if they are privileged, which I don't think I need to reach, Mr. Dunlap indicated his opinion would remain the same.

The trial court's order granting summary judgment incorporated its oral ruling fully. Other than the court's statements at oral argument that it was not relying on either the State's arguments about "technical defects" or Dunlap's reliance on privileged documents, the court did not address the State's evidentiary objections. Instead, the written order lists all of the evidence submitted and considered without any ruling regarding the admissibility of any portions thereof. The order listed all the pleadings and files the court had reviewed, including "Plaintiff's Response to Defendant State of Washington's Motion for Summary Judgment," the Nestors' attorney's declaration, and the "Notice of Errata" regarding her declaration, which added the language certifying the contents under penalty of perjury.

Here, even though the State used the proper procedure to object to the admissibility of evidence, the court never ruled on the objections. Without rulings to review, we cannot address the issues raised in the State's cross-appeal. "It is our duty to review evidentiary rulings made by the trial court; we do not ourselves make evidentiary rulings." Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC, 139 Wn. App. 743, 756, 162 P.3d 1153 (2007). Moreover, "[i]t is our task to review a ruling on a motion for summary judgment based on the precise record considered by the trial court." Id. at 754-55 (citing Wash. Fed'n of State Employees, Council 28 v. Office of Fin. Mgmt., 121 Wn.2d 152, 163, 849 P.2d

1201 (1993)). Therefore, in reviewing the trial court's ruling on summary judgment, we consider the entirety of the record the parties submitted and that the court considered, as identified in its written order.

## II. Summary Judgment Dismissal of Negligence Claim

The Nestors argue the trial court erred by granting summary judgment on the issues of breach and causation. We review orders on summary judgment de novo. Kim v. Lakeside Adult Fam. Home, 185 Wn.2d 532, 547, 374 P.3d 121 (2016). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998) (citing CR 56(c)). The moving party has the initial burden of showing the absence of an issue of material fact. In re Est. of Black, 153 Wn.2d 152, 160, 102 P.3d 796 (2004). We construe evidence and reasonable inferences in the light most favorable to the nonmoving party. Id. at 161.

If the moving party meets this burden, the nonmoving party must set forth specific facts to show a genuine issue for trial. Id. The facts must rebut the moving party's contentions and demonstrate the existence of a genuine issue of material fact. Citibank South Dakota N.A. v. Ryan, 160 Wn. App. 286, 289, 247 P.3d 778 (2011).

To prove negligence, a plaintiff must show (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). Generally, whether there has been negligence "is a jury question, unless the facts are such

9

that all reasonable persons must draw the same conclusion from them, in which event the question is one of law for the courts." Hough v. Ballard, 108 Wn. App. 272, 279, 31 P.3d 6 (2001).

Whether a duty exists is a question of law. Degel v. Majestic Mobile Manor, Inc., 129 Wn.2d 43, 48, 914 P.2d 728 (1996). The Washington Supreme Court has established that "a municipality owes a duty to all persons, whether negligent or fault-free, to build and maintain its roadways in a condition that is reasonably safe for ordinary travel." Keller v. City of Spokane, 146 Wn.2d 237, 249, 44 P.3d 845 (2002). However, municipalities are not insurers against accidents or guarantors of public safety and "are not required to 'anticipate and protect against all imaginable acts of negligent drivers.' " Id. at 252 (quoting Stewart v. State, 92 Wn.2d 285, 299, 597 P.2d 101 (1979)). Instead, the duty extends only to the "foreseeable acts of those using the roadways." Keller, 146 Wn.2d at 252. The parties agree that the State owed the Nestors the duty to exercise reasonable care to design and maintain public highways "reasonably safe for ordinary travel."[7]

The question of whether a roadway was reasonably safe for ordinary travel is a question of fact that must be answered in light of the totality of circumstances. Wuthrich v. King County, 185 Wn.2d 19, 27, 366 P.3d 926

---

[7] The State argues that White's extreme and reckless driving did not constitute "ordinary travel." However, it conflates the analysis of *whether* the State had a duty with the scope of that duty, which is part of the analysis of whether it *breached* the duty. The State owes a duty to all drivers, including the Nestors, to keep the road reasonably safe for ordinary travel. Whether the type of collision that occurred was foreseeable is integral to both the duty and causation analysis as they are interrelated. Lowman v. Wilbur, 178 Wn.2d 165, 169, 309 P.3d 387 (2013). "In the context of liability for negligent roadway design or maintenance, any consideration of the legal cause question should . . . begin with a review of the duty question." Id. Reasonable care is owed and the resulting injury must not be too remote under legal causation. Id. at 170.

(2016). The plaintiff does not need to prove a particular defect resulting in inherently dangerous conditions. Xiao Ping Chen v. City of Seattle, 153 Wn. App. 890, 901, 223 P.3d 1230 (2009). Rather, a trier of fact may infer a breach of the duty of care based on the surrounding circumstances. Id. For example, in Xiao Ping Chen, a plaintiff raised genuine issues of material fact as to whether the City of Seattle breached its duty to a pedestrian who was struck and killed in a crosswalk where evidence showed the city had been aware of several accidents or near-accidents at the same crosswalk, citizens had complained of the danger and requested installation of a traffic signal at the location, and two experts opined as to the dangerous conditions. 153 Wn. App. at 909-10. That particular crosswalk had at least eight other accidents, including a fatality in exactly the same location, which provided ample evidence that the city had breached its duty to maintain the crosswalk in a condition reasonably safe for ordinary travel. Id. at 895, 909-10.

In Owen v. Burlington Northern and Santa Fe R.R. Co., the court determined that summary judgment was inappropriate because reasonable minds could differ as to whether the roadway was reasonably safe for ordinary travel and appropriate corrective action had been taken. 153 Wn.2d 780, 790, 108 P.3d 1220 (2005). Owen involved a fatal accident where a road intersected a set of railroad tracks. Id. at 784. At that location, the train crossing had a high volume of both vehicle and train traffic, and nearby traffic signals frequently caused cars to queue over the train tracks. Id. at 789. Additionally, the incline of the road limited drivers' ability to see the traffic signals or approaching trains. Id.

The absence of any remedial measures for the conditions at the railroad crossing provided evidence from which a jury could conclude that roadway was not reasonably safe for ordinary travel. Id. at 790.

By contrast, in Ruff v. County of King, our Supreme Court held there was no issue of material fact as to whether the county had provided a road that was reasonably safe for ordinary travel, despite its not installing a guardrail at the accident site. 125 Wn.2d 697, 704, 887 P.2d 886 (1995). There, the plaintiff was a passenger in a car that passed another car while approaching a curve on a two-lane county road. Id. at 700. The driver crossed over the double yellow line into the oncoming lane and continued to drive straight off the road into a stream bed, landing upside down. Id. The undisputed evidence established that the road was in excellent condition, the markings and signing were appropriate, and the road width, including the shoulder, was standard, and none of the experts testified that the roadway was inherently dangerous or deceptive. Id. at 706. Thus, even though the experts stated that a guardrail would have redirected the vehicle, none opined that a guardrail would have prevented injury. Id. at 706-07.

In support of its motion for summary judgment, the State provided several opinions on the safety of the highway at the collision site. Assistant State Design Engineer for Washington State Department of Transportation (WSDOT), John Donahue submitted a declaration and opined, based on his training and experience, that the condition of the ramp "meets or exceeds the relevant published design criteria/expectations for similar facilities, available to highway engineers in Washington in 1957, 1960, and 2021." Specifically, the layout and

dimensions "confirm the intention of the designers to achieve the required transition and reduction in operating speeds necessary to navigate the subject ramp and its curves."

Additionally, Donahue discusses the idea of "a clear zone," defined as "a clear, traversable area in which an errant vehicle can recover" which is normally preferable to installing a traffic barrier because a barrier "normally increases the number of crashes, as it reduces the roadside area in which an errant vehicle may recover." A clear zone's required dimensions are based on the roadway's posted speed, traffic volume, and slope of the roadside, and WSDOT's Design Manual for a highway sets 54 feet as the widest clear zone recommended for highest posted speed (70 m.p.h.) and traffic volume. The American Association of State Highway and Transportation Officials (AASHTO) Roadside Design Guide provides for a clear zone of 69 feet for areas with the highest speeds and traffic volumes. The design criteria for the location where White's vehicle ran off the road would require a clear zone of 10 feet under WSDOT recommendations and 27 feet under AASHTO. Here, the distance between the point where White's vehicle left the roadway and collided with the Nestors' vehicle was about 100 feet, far in excess of recommendations from the relevant design standards.

In response to the State's evidence that the highway's design satisfies design and safety standards, the Nestors contend that evidence of prior collisions and expert opinion on the design of the roadway raise questions of fact that preclude summary judgment in this case. In his analysis of the crash location, Dunlap noted the "uniqueness of the geometry" of the interchange, which he

described as a "folded diamond configuration." He noted that 13 total accidents

had occurred involving the southbound I-5 to Northgate Way ramps between

October 2011 and January 2020. Dunlap summarized the accidents as follows:

> Of the 13 reported accidents we are aware of, 9 occurred
> prior to the subject collision, 1 occurred 10 hours after the subject
> collision, and 2 occurred along the southbound 1-5 to eastbound
> Northgate Way off-ramp. A review of the summary indicates that all
> 11 collisions that occurred along the subject off-ramp involved a
> vehicle that left the roadway and collided with an object or another
> vehicle. The last accident in the list indicates that an errant vehicle
> ran off the left side of the subject off-ramp, struck a sign, and
> crossed the on-ramp, ultimately striking a fence as opposed to
> another vehicle only 10 hours after the subject collision. What's
> more, 10 of the 11 collisions were listed as speed related, indicating
> the signs installed . . . were insufficient by themselves to provide a
> safe roadway for the traveling public.

This past history of collisions in the vicinity led to Dunlap's opinion on the safety

of the roadway. In his report, Dunlap opined, "It is incumbent upon a public

agency like WSDOT to provide safe roads for the traveling public, free of

hazardous trap conditions like what existed at the subject accident location."

According to Dunlap, "[w]hen it became apparent that motorists were either

failing to observe or understand the signage, WSDOT should have availed

themselves of additional safety improvements in the form of [sic] guardrail along

the outside of a problem curve (at the very least)," and installation of larger signs

and flashing beacons to draw the attention of drivers.

However, Dunlap admitted that regarding the "folded diamond

configuration" design, "you do find them and they are around Southern California

throughout quite a few locations," and he was not opining that the intersection

was defective when it was designed. Moreover, the other collisions that occurred

near the I-5 southbound exit at Northgate Way have little similarity to this case. While all of the accidents involved cars running off the road by proceeding straight somewhere along the curve of the exit ramp, none of them occurred at the same location at issue. Two of the accidents involved the eastbound ramp. Of the eleven collisions on the westbound ramp, four involved a single vehicle leaving the roadway on the second curve of the ramp, where it turned left, and then striking a sign, curb, or ditch. By contrast, White's vehicle left the road at the first curve of the ramp as the road turned right. The State's evidence shows that the clear zone far exceeded design recommendations at the location that White's vehicle left the road.[8] For incidents where vehicles also left the roadway at the first curve, none appear to have crossed the clear zone and reached the on-ramp or collided with another vehicle. In all prior crashes in that location, the vehicles came to a stop in the grassy area comprising the clear zone as designed. The clear zone functioned properly in cases of ordinary travel. Thus, the prior

---

[8] Dunlap stated that the road has a curb that defeats the clear zone. The curb is "going to present an object that will trip or launch vehicles. And so it's on the outside of a curve. It doesn't need to be on the outside of the curve. That vertical curb needs to go." However, Dunlap acknowledged he could not opine as to whether the area was a clear zone because he had not conducted a survey of the area. Dunlap acknowledged that the AASHTO definition determines the existence of a clear zone. Dunlap also inaccurately described the curb as vertical, rather than sloped.

State's expert Donahue opined that the curb did not preclude the grassy area's function as a clear zone: "Based on Washington and National Standards a curb like the one outlined above is not a factor in determining the clear zone, as it does not represent an object that would indicate the need for barrier or shielding." Further, Donahue stated that "[t]he Roadside Design Guide discusses curbing of various types, and indicates a strong preference for a sloping curb of less than four inches, which this is." And AASHTO does not consider curbs to be fixed objects in the context of clear zones. Donahue concludes, "this curb serves a functional purpose and does not preclude the grassy area adjacent to this roadway from operating as an effective clear zone." Thus, despite Dunlap's deposition testimony about concerns due to the curb, his opinion does not create a fact question as to whether the clear zone satisfied highway design standards.

collisions do not establish that the part of the roadway at issue was unsafe for ordinary travel.

According to Dunlap and the Nestors, the main breach of the State's duty is the lack of a guardrail due to the configuration of the highway interchange. But Dunlap does not say that the road was not reasonably safe for ordinary travel. Instead, he opined about the need for a guardrail in this location. Dunlap stated that putting in a guardrail at that location would protect people in the act of ordinary travel. In addition, he was asked, "Is it your opinion that given the design of this ramp, its proximity to the other ramp, and the collision history for this particular off-ramp, exercise of ordinary care by the State of Washington required installation of a guardrail as indicated in your report?" Dunlap responded:

> So the responsibility of the engineers is to make the roadway safe for the ordinary driver, the drivers that you would encounter on the roadway. With respect to the proximity of these ramps as they converge on the southbound direction for the off-ramp, it's foreseeable, I think, that a vehicle that leaves the south side of the curve could encroach into the on-ramp. And we have evidence, of course, that that has occurred.
> So we do know that that's a potential outcome of a vehicle that leaves the roadway. Because of that, guardrail is then, in my mind, triggered.

Dunlap opined that if a guardrail had been put into place, "the dynamic of the accident completely changes, and innocent bystanders and people can be protected."

John Milton, Director of Transportation Safety and Systems Analysis at WSDOT, provided his opinion that a guardrail would not improve safety at the location of the accident and could actually increase crash severity and the likelihood of collisions with cars on the on ramp:

> It is far preferred to have a clear zone free from fixed objects, as is the case with the open grassy area that exists at this location. This is because fewer crashes will occur, when compared to a location that might have guardrail. Additionally, crashes that happened at this location were single vehicle, all of which proceeded into the grassy area adjacent to the curve. With a barrier installed the result would be to potentially increase the crash severity, with a higher potential of redirection into other vehicles traveling on the ramp. Thus, the crash costs would likely increase not decrease with a guardrail or other barrier.

This reflects Dunlap's deposition testimony that with a guardrail in place, "there's still an accident. It's just different." Dunlap did not opine in his report or offer testimony that the road as designed was not reasonably safe for ordinary travel. Thus, the Nestors' evidence fails to create an issue of fact as to whether the lack of a guardrail was a breach of the State's duty to provide roads safe for ordinary travel.

White's conduct was far from ordinary and amounted to criminal conduct and homicide. White was impaired and driving recklessly. Despite advisory speed signs indicating first 35 m.p.h. and then 25 m.p.h., White continued to drive at a speed in excess of 91 m.p.h. In addition, White failed to apply the full braking power of his vehicle when he lost control. According to accident reconstructionist Nathan Rose, at the point where White was traveling 91 m.p.h., his vehicle braking system had the capacity to stop short of even entering the median. With his actual brake input, White would have come to a stop before entering the on-ramp and colliding with the Nestors even if he had been traveling at 77 m.p.h., over three times the posted speed of 25 m.p.h.

Given the I-5 speed limit of 60 m.p.h., and the advisory speeds of 35 m.p.h. and 25 m.p.h. on the exit ramp, White's driving in excess of 91 m.p.h.

while impaired was clearly not a foreseeable act of those using the roadway. Rose's analyses demonstrate that White would not have left the roadway at 91 m.p.h. had he applied his full braking capacity. The grassy area serving as the clear zone had stopped all prior accidents at that location.

Dunlap's opinion does not raise a question of fact as to whether the roadway at issue complied with applicable design and safety requirements. At most, he suggests that a guardrail would have prevented the accident. But not only is this speculation, whether a different design would have led to a different result is not the standard for determining breach. The State was not required to anticipate or protect against criminally dangerous driving such as White's. See Keller, 146 Wn.2d at 252 (municipalities not required to anticipate and protect against all imaginable acts of negligent drivers.). Based on the admissible evidence in the form of the expert opinions, the Nestors have failed to raise any issues of material fact as to whether the State breached its duty to exercise ordinary care to provide roadways that are reasonably safe for ordinary travel. Therefore, we need not reach the elements of legal causation or cause-in-fact. Summary judgment was properly granted for the State.

III. Discretionary Immunity

Although we affirm the summary judgment dismissal of the Nestors' claim against the State, we also address the State's invocation of discretionary immunity as a defense, as the court granted dismissal on this basis in the alternative.

Discretionary immunity is a narrow exception to the State's waiver of sovereign immunity, wherein "discretionary" governmental acts are immune from tort liability. Taggart v. State, 118 Wn.2d 195, 214-15, 822 P.2d 243 (1992). We apply a four-factor test to determine when discretionary immunity applies:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

Evangelical United Brethren Church of Adna v. State, 67 Wn.2d 246, 255, 407 P.2d 440 (1965). "In order for a decision to qualify as discretionary, the State must show that the decision was the outcome of a conscious balancing of risks and advantages. And the decision must be a basic policy decision by a high-level executive." Avellaneda v. State, 167 Wn. App. 474, 481, 273 P.3d 477 (2012) (internal citations omitted). For example, in Avellaneda, the decision at issue was WSDOT's calculation of the priority for installation of a cable barrier on the median of a highway. 167 Wn. App. at 482-83.

The State argues that Highway Safety Executive Committee's implementation of the legislature's policy of priority programming for highway improvements under RCW 47.05.010 entitles it to discretionary immunity. However, the State has not identified a specific policy decision related to the location at issue. Based on the fatality and injury crash screening criteria, the

location failed to make the 2012 ranked list of locations requiring safety measures. As of 2016, a newly adopted evaluation method excludes ramp segment locations because they most often do not have fatal and serious crashes warranting consideration for additional measures. Unlike in <u>Avellaneda</u>, where the WSDOT calculated the benefits and costs of the project and made a determination of its priority, here, the State has not established that the lack of additional safety measures—such as a guardrail at the crash site—reflects a high-level decision rather than a conclusion based on the application of screening criteria or lack of evaluation. Without a policy decision by a high-level executive, the State cannot establish an entitlement to discretionary immunity. The trial court erred by granting summary judgment on this ground.

Nevertheless, because we may affirm on any basis, we conclude that summary judgment dismissal of the Nestors' claim against the State was proper based on our resolution of the issue of breach of duty.

Affirmed.

_Chung, J._

WE CONCUR:

_Coburn, J._          _Dwyer, J._